DEBRA ANN LIVINGSTON, Circuit Judge,
dissenting:
Alfred Caronia was convicted of conspiring to introduce a prescription drug into interstate commerce with the intent that it be used in ways its labeling neither disclosed nor described. This intent was revealed, inter alia, through his speech. Because the First Amendment has never prohibited the government from using speech as evidence of motive or intent, see Wisconsin v. Mitchell, 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), I would affirm Caronia’s conviction. By holding, instead, that Caronia’s conviction must be vacated — and on the theory that whatever the elements of the crime for which he was duly tried, he was in fact convicted for promoting a drug for unapproved uses, in supposed violation of the First Amendment — the majority calls into question the very foundations of our century-old system of drug regulation. I do not believe that the Supreme Court’s precedents compel such a result. I therefore respectfully dissent.
I. Intended Uses
Alfred Caronia was convicted of conspiring to introduce a “misbranded” drug into interstate commerce. See 18 U.S.C. § 371; 21 U.S.C. § 331(a). Under the Federal Food, Drug and Cosmetic Act (“FDCA”), one way in which a drug is misbranded is if its labeling lacks adequate directions for layperson use. See 21 U.S.C. § 352(f)(1); 21 C.F.R. § 201.5. Whether a drug’s directions are “adequate ... for use” depends on the drug’s intended uses. This is because the Food and Drug Administration (“FDA”) defines “adequate directions for use” as “directions under which the layman can use a drug safely and for the purposes for which it is intended,” 21 C.F.R. § 201.5 (emphasis added). Directions are adequate only if they include, for example, “[statements of all ... uses for which such drug is intended,” and “usual quantities [of dose] for each of the uses for which it is intended.” 21 C.F.R. § 201.5(a), (b). This labeling provision is in part merely a disclosure requirement for the benefit of a drug’s lay users. But some uses of drugs are never safe, at least for a layperson; because it is impossible to provide adequate directions for such uses, this provision also effectively prohibits introducing drugs into interstate commerce with the intent that the drugs be used in ways that are unsafe for laypersons.[1]
*170 The labeling on the drug at issue in this case, Xyrem, stated that it was “indicated for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy.” At all relevant times, the FDA had not approved Xyrem for any other uses. Xyrem’s labeling did not state any other intended uses for the drug, nor provide directions for any other intended uses. Unsurprisingly, then, Caronia did not argue before the jury that Xyrem’s labeling included adequate directions for the off-label uses that he was alleged to have promoted. Rather, his trial focused on whether Caronia agreed with his employer, Orphan Medical, Inc. (“Orphan”), and with others associated with Orphan, that Xyrem would be distributed for off-label use.
Determining a product’s “intended uses” has long been a central concern of food and drug law. The concept originated in the Pure Food and Drugs Act of 1906, Pub.L. No. 59-384, 34 Stat. 768, which prohibited introducing any adulterated or misbranded drug into interstate commerce, id. § 2, 34 Stat. at 768, and which defined “drug” to include “any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease,” id. § 5, 34 Stat. at 769 (emphasis added). Courts found violations of that statute where, as in this case, a manufacturer’s speech demonstrated an intended use that brought it within the scope of the statute such that its label was required affirmatively to disclose certain information. See, e.g., United States v. Eleven Cartons of Drug Labeled in Part “Vapex,” 59 F.2d 446 (D.Md.1932) (holding that “Va-pex” was “intended to be used for the cure, mitigation or prevention of disease,” and was thus a “drug,” because its label stated that it was “effective to relieve a head cold instantly,” id. at 447; and further holding that the drug was misbranded, even “assuming] that the inhalation of Vapex is innocuous,” because it was “required to contain a declaration on the label of the alcoholic content” yet failed to do so, id. at 449).
When Congress expanded the law three decades later in the Food, Drug, and Cosmetic Act of 1938, Pub.L. No. 75-717, 52 Stat. 1040, its revisions remained anchored to the concept of “intended uses.” The definition of “drug” was broadened to also include “articles ... intended to affect the structure or any function of the body,” id. § 201(g)(3), 52 Stat. at 1041 (emphasis added), and the parallel category of “devices” was created and similarly defined in terms of intended uses, see id. § 201(h), 52 Stat. at 1041. At the same time, Congress broadened the definition of a “misbranded” drug to include any drug with labeling not bearing “adequate directions for use.” Id. § 502(f)(1), 52 Stat. at 1051. Under the 1938 Act, courts upheld convictions for introducing drugs into interstate commerce that lacked adequate labeling for their intended uses, and routinely relied on “oral representations made by ... authorized sales distributors” to determine a product’s intended uses. V.E. Irons, Inc. v. United States, 244 F.2d 34, 44 (1st Cir.1957) (upholding a conviction for introducing into interstate commerce “articles of drug [that] were misbranded in that their labeling failed to bear ‘adequate directions for use’ for the various diseases and conditions for which they were intended,” and relying on “both graphic materials distributed and testimony of oral representations to users and prospective users.... showing] that the products shipped were to be used as drugs”).
The modern FDCA continues to define “drugs” (and “devices”) on the basis of an article’s intended uses. See 21 U.S.C. § 321(g)(1)(B), (C); 21 U.S.C. § 321(h)(2), (3). The concept of “intended uses” therefore largely defines the scope of the FDA’s *171 regulatory authority. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 126, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). To put the matter in practical terms: it is because of the “intended uses” principle that hardware stores are generally free to sell bottles of turpentine, but may not label those bottles, “Hamlin’s Wizard Oil: There is no Sore it will Not Heal, No Pain it will not Subdue.”[2]
According to regulations that have remained essentially unchanged for sixty years, see 17 Fed.Reg. 6818, 6820 (1952) (codified at 21 C.F.R. § 1.106(o) (Cm.Supp.1955)), the FDA defines a drug’s “intended uses” on an objective, rather than subjective, basis:
The words intended uses or words of similar import ... refer to the objective intent of the persons legally responsible for the labeling of drugs. The intent is determined by such persons’ expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised.... [I]f a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put.
21 C.F.R. § 201.128. As previously noted, Caronia did not contend at trial that Xy-rem’s label (which provided dosage and other instructions for Xyrem’s use in the treatment of narcolepsy patients who experience cataplexy and excessive daytime sleepiness) provided adequate instructions for any other use. In this case, then, Xyrem was “misbranded” — and Caronia could be guilty of conspiring with others to introduce it into interstate commerce in such a state — if the conduct and statements of the persons legally responsible for labeling the drug (or the conduct and statements of their representatives) demonstrated an objective intent that Xyrem be used for off-label purposes.
II. The First Amendment and Speech as Evidence of Intent
It is well settled that “[t]he First Amendment ... does not prohibit the evi-dentiary use of speech to establish the elements of a crime or to prove motive or intent.” Wisconsin v. Mitchell, 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993). To demonstrate that Xyrem was intended for off-label uses (and thus that it was misbranded) the prosecution in this case relied, inter alia, upon Caronia’s statements that Xyrem could be used to treat “insomnia, [f]ibromyalgia[,] periodic leg movement, restless leg, ... Parkin *172 son’s and ... MS.”[3] Because Caronia’s speech was used simply as evidence of Xyrem’s intended uses, I agree with the government that Caronia’s conviction does not run afoul of the First Amendment.
The majority unsurprisingly agrees that speech may be used as evidence of intent. It even leaves open the possibility that speech may serve as evidence of intent to introduce a misbranded drug into interstate commerce. See Maj. Op. at 161. The majority nonetheless concludes that in this particular case “the government clearly prosecuted Caronia for his words — for his speech” and not for conspiring to introduce a misbranded drug into interstate commerce. Maj. Op. at 161. I disagree that the government prosecuted Caronia for his speech. I also fail to see how the majority’s reasoning would ever allow such speech to support a conviction under 21 U.S.C. § 331(a). For this reason, I conclude the majority’s opinion is fundamentally at odds both with Mitchell and with the underlying premises behind much of the FDCA’s regulatory scheme.
I do not agree with the majority that Caronia was “prosecuted and convicted for promoting Xyrem off-label.” Maj. Op. at 161. The district court correctly instructed the jury as to all the elements necessary to prove a conspiracy, as well as the additional elements, derived from 21 U.S.C. § 331(a), to prove the conspiracy’s unlawful purpose:
To sustain the charge of conspiracy to introduce into interstate commerce a misbranded drug, the Government must prove the element[s] of conspiracy as I previously described them for you and must also prove the following elements of misbranding through the introduction of a misbranded drug into interstate commerce.
First, the Government must prove that the defendant conspired to introduce or conspired to cause to be introduced a drug into interstate commerce or conspired to deliver a drug for introduction into interstate commerce or conspired to cause a drug to be delivered for introduction into interstate commerce.
Second, the Government must prove that the drug was misbranded, as I’ve previously defined that term.
If you find that the Government has satisfied its burden with respect to each of these elements, along with satisfying the elements of conspiracy as I have previously explained them to you, then you should find the defendant guilty of that prong of the conspiracy count charging him with conspiracy to mis-brand in violation of Section 331(a).
*173 The majority makes much of the fact that the district court also instructed the jury that “[a] misbranded drug may be shown by a promotion of the drug by a distributor for an intended use different from the use for which the drug was approved by the Food and Drug Administration.” But this wholly appropriate charge was but part of the district court’s explanation of the “objective intent” standard with respect to “intended uses”:
The intended use of a drug can be determined from its label, accompanying labels, promotional material, advertising or any other relevant source that reveals the manner in which the drug’s distributors expect[ ] the product to be used. A misbranded drug may be shown by a promotion of the drug by a distributor for an intended use different from the use for which the drug was approved by the Food and Drug Administration, the Government agency charged with the responsibility for approving a drug’s use. Under 21 Code of Federal Regulations, Section 201.128, intended use or words of a similar import refer to the objective intent of the persons legally responsible for the labeling of drugs. The intent is determined by such persons’ expressions or may be shown by the circumstances surrounding the distribution of the drug. This objective intent may, for example, be shown by labeling claims, advertising matter or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the drug is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled, nor advertised.
Granted, in a single sentence at the conclusion of this instruction the district court stated that drug manufacturers “are not permitted to promote uses for a drug that have not been cleared by the United States Food and Drug Administration.” In context, however, the district court was simply instructing the jury that promotion of an off-label use may demonstrate an objective intent that a drug be used for off-label purposes — and thus that it is being placed into interstate commerce without proper labeling. And this, contrary to the majority’s suggestion, was not error.[4] See United States v. Sabhnani, 599 F.3d 215, 237 (2d Cir.2010) (admonishing that jury instructions are not to be read in isolation, but in their entirety, to determine whether they communicate the “essential ideas” to the jury); accord United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008); see also Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 38 L.Ed.2d *174 368 (1973) (“[A] single instruction to a jury-may not be judged in artificial isolation, but must be viewed in the context of the overall charge.”).
The majority also focuses on the prosecution’s summations, arguing that the government did not use Caronia’s promotion of Xyrem as evidence of misbranding, but rather “prosecuted Caronia for his off-label promotion.” Maj. Op. at 158 (emphasis added). Suffice it to say, however, that any claim that Caronia was convicted for his speech, as opposed to his conspiracy, is belied by the fact that, as the majority rightly concedes, the district court explained the elements of conspiracy and misbranding to the jury and instructed that each element must be shown beyond a reasonable doubt. We presume that juries follow their instructions. United States v. Williams, 690 F.3d 70, 77 (2d Cir.2012). Caronia, moreover, objected not at all to the prosecution’s references to his off-label promotion of Xyrem — and unsurprisingly, since read in context, the government properly referred to this promotion to prove Caronia’s participation in a conspiracy to distribute Xyrem for uses that its labeling neither described nor explained.
At bottom, the majority is troubled that “the simple promotion of a drug’s off-label use” can lead to criminal liability under the FDCA. Maj. Op. at 160. That is, where all that a drug manufacturer (or its representative) does is sell a prescription drug and promote it for an off-label purpose, the majority concludes that prosecution raises serious First Amendment concerns — and regardless whether the off-label promotion is presented as mere evidence or as the proscribed conduct itself. The majority’s conclusion, clearly stated, is that while speech might serve as evidence of other types of mislabeling, such as false or deficient labeling, see Maj. Op. at 161-62, a mislabeling charge simply may not rest on off-label promotion.
This is a departure from precedent. My conclusion here — that promotion of a use may demonstrate an objective intent that the drug be used for that purpose — has long been endorsed by this Circuit. See United States v. Writers & Research, Inc., 113 F.3d 8, 11 (2d Cir.1997) (“We agree with the district court that, as a matter of law, if 714X was promoted as a treatment or cure for cancer, AIDS, or other diseases, it is subject to the requirements of the FDCA....”); United States v. An Article Consisting of 216 Individually Car-toned Bottles, 409 F.2d 734, 739 (2d Cir.1969) (“It is well settled that the intended use of a product may be determined from its label, accompanying labeling, promotional material, advertising, and any other relevant source.... Thus, Congress has made a judgment that a product is subject to regulation as a drug if certain promotional claims are made for it.”). Such use of speech, moreover, has never been prohibited by the First Amendment. See Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 2664-65, 180 L.Ed.2d 544 (2011) (“[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove ‘White Applicants Only’ signs; why an ordinance against outdoor fires might forbid burning a flag; and why antitrust laws can prohibit agreements in restraint of trade.”) (citations and some internal quotation marks omitted).
It is true that the introduction of Xyrem into interstate commerce by Caronia’s employer was generally legal so long as the drug was not intended to be used for purposes that lacked adequate directions on its labeling. It is also true that, absent Caronia’s speech (and speech by other Or *175 phan representatives), the jury likely would not have found that Xyrem was intended for such off-label uses. Consistent with the First Amendment, however, otherwise permissible conduct may become impermissible if undertaken with a prohibited motive, and speech may be used as evidence of such a motive. An employer, for example, is generally free to refuse to promote an employee simply because he does not like the employee’s attitude, but he may not refuse to promote the employee because of her sex. See Wisconsin v. Mitchell, 508 U.S. at 487, 113 S.Ct. 2194 (“In Hishon [ v. King & Spalding, 467 U.S. 69, 78, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ], we rejected the argument that Title VII infringed employers’ First Amendment rights.”). The First Amendment does not bar using the employer’s speech to demonstrate his discriminatory motive. See Wisconsin v. Mitchell, 508 U.S. at 490, 113 S.Ct. 2194 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 251—52, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion)). Indeed, as the crimes of attempt, conspiracy, and inducement demonstrate, “[wjords alone may constitute a criminal offense, even if they spring from the anterior motive to effect political or social change.” United States v. Freeman, 761 F.2d 549, 551 (9th Cir.1985) (Kennedy, J.). See generally Kent Gree-nawalt, Speech, Crime, and the Uses of Language 6-7 (1989) (enumerating twenty-one crimes that “critically involve communication,” id. at 7). Simply put, that Caro-nia was otherwise free to introduce Xyrem into interstate commerce does not give him a First Amendment right to introduce it into interstate commerce for any intended purpose he wished.
Caronia attempts to distinguish this line of authority by arguing that he merely discussed “a perfectly lawful practice: the use of a lawful drug, Xyrem, for off-label purposes.” Appellant’s Reply Br. at 10. But the fact that a physician or a patient could legally use Xyrem for an off-label purpose is not enough to make out Caro-nia’s First Amendment claim. There might be no law forbidding the consumption of arsenic. But this would not endow Abby and Martha with a First Amendment right to offer arsenic-laced wine to lonely old bachelors with the intent that they drink it. See Arsenic and Old Lace (Warner Bros. Pictures 1944). And any statements Abby or Martha made suggesting their intent — even if all of the statements were truthful and not misleading — would not be barred from evidence by the First Amendment simply because arsenic might legally be consumed.[5]
Although Caronia relies heavily on the Supreme Court’s decision in Thompson v. *176 Western States Medical Center, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002), that case did not discuss the use of speech as evidence of intent. The statute at issue in Western States, as the government conceded before the Supreme Court, regulated speech directly rather than as evidence of intent. See id. at 364-65, 122 S.Ct. 1497 (“[T]he pharmacy, licensed pharmacist, or licensed physician compounding the drug may ‘not advertise or promote the compounding of any particular drug, class of drug, or type of drug’....”) (quoting 21 U.S.C. § 353a(c)); Western States, 535 U.S. at 370-71, 122 5.Ct. 1497 (“The Government argues that advertising ... is ‘a fair proxy for actual or intended large-scale manufacturing. ...’”) (emphasis added). The statute at issue in Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011), also targeted speech directly. See id. at 2660 (“Pharmaceutical manufacturers and pharmaceutical marketers shall not use prescriber-identifiable information for marketing or promoting a prescription drug unless the prescriber consents....”) (quoting Vt. Stat. Ann., Tit. 18, § 4631(d) (Supp.2010)). By contrast, Caronia’s conviction required a finding that Xyrem was intended by those responsible for its labeling for an off-label use — a finding which “may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised.” 21 C.F.R. § 201.128. See generally Krista Hessler Carver, A Global View of the First Amendment Constraints on FDA, 63 Food & Drug L.J. 151, 187-88 (2008).
Put another way, if the jury had concluded there was a reasonable doubt as to whether Caronia and Orphan actually intended to sell Xyrem to Caronia’s customers — to introduce it into interstate commerce — then Caronia could not have been convicted under § 331(a), no matter what he said. By contrast, a pharmacy would violate the statute in Western States as soon as it advertised the compounding of particular drugs. See 535 U.S. at 364-65, 122 S.Ct. 1497 (citing 21 U.S.C. § 353a(c)). Similarly, a Vermont pharmacy would violate the statute in Sorrell as soon as it disseminated prescriber-identifying information for marketing purposes. See 131 S.Ct. at 2660. Speech alone was sufficient to trigger liability under the challenged statutes in those cases. Speech alone is not, however, sufficient to sustain a conviction under 21 U.S.C. § 331(a).
My analysis here is not original. The D.C. Circuit reached the same conclusion in Whitaker v. Thompson, 353 F.3d 947, 953 (D.C.Cir.2004),[6] in which a plaintiff argued that he had a First Amendment right to label his product with a drug claim despite its lack of FDA approval. The Whitaker court disagreed, reasoning that:
Assuming that the government may condition the sale of drugs on passage through the elaborate testing that the statute requires ..., the key step is the [ ]FDCA principle that classification of a substance as a ‘drug’ turns on the nature of the claims advanced on its behalf. That principle, in turn, rests on the idea that claims about a product by its manufacturer and vendors, including product labeling, serve as evidence of the sellers’ intent that consumers will purchase and use the product for a particular purpose — and, therefore, as evidence whether the product is or is not a drug. The question is whether this use of speech to infer intent, which in turn renders an otherwise permissible act unlawful, is constitutionally valid. In fact, *177 the First Amendment allows ‘the eviden-tiary use of speech to establish the elements of a crime or to prove motive or intent.’ Thus it is constitutionally permissible for the FDA to use speech, in the form of labeling, to infer intent for purposes of determining that [the plaintiffs] proposed sale of saw palmetto extract would constitute the forbidden sale of an unapproved drug.
Id. (citations and paragraph breaks omitted). Caronia attempts to distinguish Whitaker by arguing that “the drug itself in Whitaker could not be sold lawfully, and so there were no lawful off-label uses to promote.” Appellant’s Reply Br. at 15 (internal quotation marks and brackets omitted). But the product in Whitaker— “ ‘saw palmetto,’ an extract from the pulp and seed of the dwarf American palm,” Whitaker, 353 F.3d at 948—could be sold lawfully so long as it was not a “drug,” and whether it was a drug depended entirely upon the plaintiffs speech, as evidence of his intent, when he offered it for sale. That case is therefore indistinguishable from this case; indeed, even if the FDA had not approved Xyrem for any medical uses at all, Caronia could presumably have sold Xyrem as an industrial solvent if it happened to be excellent at removing grease and grime.
Not every prohibition on conduct undertaken with a certain intent is necessarily constitutional: the problem posed by a ban on “sending any leaflet with the intent to influence another’s vote” suggests the limits on the analysis here. It remains the case, however, that the simple fact that one is generally allowed to sell something does not imbue one with a constitutional right to sell it for any intended purpose. And the prohibition here on distributing drugs with the intent that they be used for purposes not supported by their labeling is entirely consistent with the broader purposes of the FDCA — namely, minimizing those occasions on which patients use drugs that have not been shown to be safe and effective.
III. Applying Central Hudson and Sorrell
Finally, even if using Caronia’s speech as evidence of his intent was not necessarily constitutionally permissible — in other words, even if the protection afforded to commercial speech requires an analysis of this question where the customers of a product like Xyrem may lawfully use it for purposes not addressed in the label, and where the FDA does not purport to regulate the claims made by unrelated third parties about the efficacy of such uses, see George W. Evans & Arnold I. Friede, The Food and Drug Administration’s Regulation of Prescription Drug Manufacturer Speech: A First Amendment Analysis, 58 Food & Drug L.J. 365, 390 (2003) — I believe the correct application of commercial speech principles requires us to uphold Caronia’s conviction. I agree with the majority that our analysis is guided by Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). I conclude, however, that the FDCA’s misbranding provision survives the scrutiny required by those eases because it directly advances a substantial government interest and is narrowly drawn to further that interest.
“[0]ne of the [FDCA]’s core objectives is to ensure that any product regulated by the FDA is safe and effective for its intended use.” Brown & Williamson, 529 U.S. at 133, 120 S.Ct. 1291 (2000) (internal quotation marks omitted). The FDCA is meant to achieve this objective through a rigorous premarket approval process. See 21 U.S.C. § 355. Under this process, a *178 manufacturer may not sell a drug without first providing proof to the FDA that the drug is “safe for use” and “effective in use.” -See id. § 355(b). There must be “substantial evidence,” including evidence from clinical investigations, “that the drug will have the effect it purports or is represented to have.” Id. § 355(d).
This process is a central, if not the central, feature of the FDCA. Prior to the passage of the FDCA, the government could combat misleading drug claims only through post-market enforcement actions. The 1938 Act’s “most substantial innovation” was to require approval of a drug’s safety before it could enter the market. Wyeth, 555 U.S. at 566, 129 S.Ct. 1187. This innovation became even more important after Congress amended the FDCA in 1962 to also require premarket approval of a drug’s effectiveness for its stated uses. See Drug Amendments of 1962, Pub.L. No. 87-781, § 102, 76 Stat. 780, 781. Behind the 1962 amendments were concerns that doctors could not adequately evaluate frequently misleading claims by drug manufacturers without a body of objective, reliable information. See, e.g., Henry A. Waxman, A History of Adverse Drug Experiences: Congress Had Ample Evidence to Support Restrictions on the Promotion of Prescription Drugs, 58 Food & Drug L.J. 299, 301-08 (2003); Alan H. Kaplan, Fifty Years of Drug Amendments Revisited, 50 Food & Drug L.J. 179, 184-85 (1995).
The Supreme Court has accordingly stated that “[pjreserving the effectiveness and integrity of the FDCA’s new drug approval process is clearly an important governmental interest.” Western States, 535 U.S. at 369, 122 S.Ct. 1497. Given the benefits of premarket approval, “the Government has every reason to want as many drugs as possible to be subject to that approval process.” Id.
The FDCA’s prohibition on off-label marketing directly advances this interest. If drug manufacturers were allowed to promote FDA-approved drugs for non-approved uses, they would have little incentive to seek FDA approval for those uses. Prohibiting such promotion is thus “one of the few mechanisms available” to encourage participation in the approval process. Washington Legal Foundation v. Friedman, 13 F.Supp.2d 51, 72 (D.D.C.1998), vacated in part, Washington Legal Foundation v. Henney, 202 F.3d 331 (D.C.Cir.2000). And premarket approval improves drug safety and effectiveness only to the extent that drugs are not sold without such approval.
In concluding that prohibiting off-label promotion does not directly advance the government’s interests, the majority places great weight on the fact that “physicians can prescribe, and patients can use, drugs for off-label purposes.” Maj. Op. at 166. But this is also true for substances that have not been approved by the FDA for any medical use at all. The law generally permits a hardware store to sell turpentine, and though such conduct may not be advisable, the law generally permits a consumer to purchase that turpentine and use it as a pain reliever. Under the majority’s reasoning, then, any substance that may be legally sold for some purpose may be promoted by its manufacturer for any purpose — so long as the manufacturer’s statements are merely unsubstantiated, rather than demonstrably false or misleading. But this reasoning would invalidate the very definitions of “drug” and “device” that undergird the entire FDCA.
The majority also emphasizes that the prohibition on off-label promotion applies only to a “particular class of speakers”— namely, drug manufacturers. Maj. Op. at 166. But drug manufacturers are the precise group that the government must en *179 courage to participate in the new drug approval process. Indeed, if the prohibition applied to any broader class of speakers, it would likely fail Central Hudson’s fourth requirement that a regulation be “narrowly drawn.” The Supreme Court’s decision in Sorrell is thus inapposite in the present circumstances. The statute there did not directly advance Vermont’s interest in protecting patient privacy because it applied to only a small subset of those groups that could possibly compromise patient privacy. See 131 S.Ct. at 2668. Drug manufacturers, in contrast, form the entirety of those speakers that could possibly undermine the new drug approval process by not participating in it.
Furthermore, allowing drug manufacturers to promote off-label uses would undermine the FDA’s approval process for not only new uses of pre-approved drugs, but also for entirely new drugs. As explained above, when determining whether a drug should be approved, the FDCA requires consideration not only of the drug’s safety, but also its effectiveness. See 21 U.S.C. § 355; United States v. Rutherford, 442 U.S. 544, 555, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (“[T]he [FDA] Commissioner generally considers a drug safe when the expected therapeutic gain justifies the risk entailed by its use.”). If a drug manufacturer must be allowed to distribute a drug for any use so long as it is approved for one use, the government’s balancing of a drug’s benefits against its risks becomes very difficult or even impossible. Drugs viewed as safe for certain uses might be considered unsafe overall if the benefits and risks being weighed are not for a specific intended use but rather for any use at all, whether supported by evidence or not.
The prohibition of off-label promotion is thus not simply a “paternalistic” attempt to shield physicians and patients from truthful information. See Maj. Op. at 166. Rather, it is a necessary tool for the effective functioning of a regulatory system that the Supreme Court has endorsed as legitimate. The majority implies that prohibiting off-label promotion is unconstitutionally “paternalistic” regardless whether the drug manufacturer’s claims are addressed to a physician or to a patient. See, e.g., Maj. Op. at 166 (“[Prohibiting off-label promotion by a pharmaceutical manufacturer while simultaneously allowing off-label use ‘paternalistically’ interferes with the ability of physicians and patients to receive potentially relevant treatment information....”) (emphasis added). But if drug manufacturers have a First Amendment right to distribute drugs for any use to physicians or even directly to patients, then the entire FDCA may well be unconstitutional.
Prohibiting off-label promotion by drug manufacturers is also the least restrictive way of advancing the government’s interests. Although the majority asserts various alternatives, none would be similarly effective. A disclaimer system or required listing of intended uses would provide manufacturers much less incentive to submit their drugs for FDA approval, and in turn encourage promotion based on data much less reliable than the clinical investigations required under 21 U.S.C. § 355(d).[7] A ceiling on off-label prescrip *180 tions would require collecting data from countless numbers of doctors and patients and, given the medical uncertainties involved, could needlessly (and simultaneously) result in the denial of some effective treatments and the over-prescription of ineffective and even dangerous ones. Finally, a ban on off-label prescriptions would be no better. Indeed, it would constitute an unprecedented intrusion into the practice of medicine, and would result in perhaps an even greater restriction on speech. See Central Hudson, 447 U.S. at 563-64, 100 S.Ct. 2343 (government free to ban “commercial speech related to illegal activity”). And again, because a product’s very definition as a “drug” depends upon its intended use (which is often established by the manufacturer’s speech), it is unclear why the majority’s less-restrictive-alternatives analysis is not equally applicable to the FDCA’s entire scheme of drug regulation.
That the FDCA is both “content- and speaker-based” within the meaning of Sor-rell, 131 S.Ct. at 2663, does not alter the foregoing analysis. Every commercial speech case, by its very nature, involves both content- and speaker-based speech restrictions. See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (“If there is a kind of commercial speech ... it must be distinguished by its content.”). Yet the Supreme Court has long acknowledged — and acknowledged again in Sorrell — that “the government’s legitimate interest in protecting consumers from commercial harms explains why commercial speech can be subject to greater governmental regulation than noncommercial speech.” Sorrell, 131 S.Ct. at 2672 (internal quotation marks omitted). Indeed, the Supreme Court struck down the ban on energy advertising in Central Hudson because a content-based less-restrictive alternative existed. See Cent. Hudson, 447 U.S. at 571, 100 S.Ct. 2343 (“[T]he Commission could attempt to restrict the format and content of Central Hudson’s advertising. It might, for example, require that the advertisements include information about the relative efficiency and expense of the offered service, both under the current conditions and for the foreseeable future.”). Sorrell did not purport to overrule the Central Hudson test, which has guided First Amendment doctrine in this area for thirty years.
Moreover, in Sorrell the Court noted that Vermont did not argue that its challenged statute “will prevent false or misleading speech.” 131 S.Ct. at 2672. Rather, Vermont’s “interest in burdening the speech of detailers instead turn[ed] on nothing more than a difference of opinion.” Id. In contrast, Congress intended the FDA approval process to prevent dangerous products with false or misleading labels from entering the market, and also to provide a base of reliable, objective information about prescription drugs that could help physicians and patients identify potentially misleading claims. Clearly this is the type of statute to which Sorrell intended that Central Hudson would still apply.[8]
*181 It is certainly true that “the ‘fear that people would make bad decisions if given truthful information’ cannot justify content-based burdens on speech.” Sorrell, 131 S.Ct. at 2670-71 (quoting Thompson, 535 U.S. at 374, 122 S.Ct. 1497). But this does not mean that conveying non-demonstrably false information to consumers must take precedence over all competing government interests. Our system of drug regulation developed to protect consumers from misleading and unsubstantiated claims about drugs’ safety and efficacy, and the prohibition on off-label promotion by drug manufacturers is essential to maintaining the effectiveness of that system. Therefore, even if such a prohibition is considered a direct regulation of speech, it is a regulation that directly advances a substantial government interest in a manner not more extensive than necessary to serve that interest. I would thus find it constitutional under Central Hudson and Sorrell.
IV. The Verdict Sheet and the Jury’s Verdict
Because I believe that the FDCA’s mis-branding provision may constitutionally be applied to Caronia’s conduct, I next address Caronia’s remaining arguments: (1) that the district court erred in breaking down the conspiracy charge on the verdict sheet into two subissues; and (2) that the jury rendered an inconsistent verdict by convicting Caronia of conspiring to introduce or deliver for introduction into interstate commerce a misbranded drug while finding him not guilty of conspiring to do an act to a drug that would result in it being misbranded.
The first count of a two-count information charged Caronia with conspiring both (1) to introduce into interstate commerce a drug that was misbranded and (2) to do an act with respect to a drug that would result in that drug being misbranded.[9] With respect to that count, the district court submitted a two-part verdict sheet to the jury which asked:
1. How do you find the defendant, ALFRED CARONIA, on Count One of the Information?
(a) Conspiracy to introduce or deliver for introduction into interstate commerce a drug, Xyrem, that was mis-branded?
NOT GUILTY_GUILTY_
(a) Conspiracy to do an act with respect to a drug, Xyrem, when such drug was held for sale after shipment in interstate commerce when such act would result in Xyrem being misbranded?
NOT GUILTY_GUILTY_ .
The jury concluded that Caronia was guilty with respect to question (a) and not guilty with respect to question (b).
Caronia argues that the district court erred by subdividing the conspiracy charge on the verdict sheet because, he claims, the district court essentially split the charge into two separate counts. But we have held that a conspiracy charge may allege an agreement to commit more than one offense, see United States v. Coriaty, 300 F.3d 244, 250 (2d Cir.2002) (“We have upheld convictions for multi-object conspiracies charged in the conjunctive even when there was insufficient evidence to support one of the objects of the conspiracy.”), and that a district court does not impermissibly constructively amend a charge by subdi *182 viding an offense into parts, see United States v. McCourty, 562 F.3d 458, 470 (2d Cir.2009) (“No constructive amendment resulted when the District Court broke the single offense into two parts to be addressed by the jury.”). I therefore find no error in the verdict sheet.
Caronia further argues that the jury rendered an inconsistent verdict by finding him not guilty of conspiring to do an act to a drug that would result in it being misbranded while finding him guilty of conspiring to introduce or deliver for introduction into interstate commerce a mis-branded drug. But these verdicts were not inconsistent — for example, the jury may have concluded that the drug was not being held for sale after shipment in interstate commerce. And even assuming the verdicts were inconsistent, “the convicted defendant’s protection against an irrational verdict is his ability to have the courts review the sufficiency of the evidence to support his conviction,” United States v. Acosta, 17 F.3d 538, 545 (2d Cir.1994). There was ample evidence for a reasonable jury to conclude beyond a reasonable doubt that Caronia conspired to introduce or deliver for introduction into interstate commerce a misbranded drug. Indeed, Caronia was caught on tape with Dr. Glee-son suggesting off-label uses of Xyrem to doctors. I therefore see no error in the verdict sheet and no inconsistency requiring reversal or vacatur in the jury’s verdict.
The majority has chosen to apply heightened scrutiny to this case, though we have not done so in other cases involving the use of speech as evidence of intent — for example, in antidiscrimination actions or prosecutions for criminal inducement, attempt, and conspiracy — cases I cannot meaningfully distinguish from this one. The majority’s decision today extends heightened scrutiny further than the Supreme Court ever has, and calls into question a fundamental regime of federal regulation that has existed for more than a century. I respectfully dissent.

. The FDA has exempted certain drugs from the requirement that their labels contain adequate directions for lay use. See 21 U.S.C. § 352(f); see, e.g., 21 C.F.R. § 201.100 (exempting certain prescription drugs); cf. United States v. An Article of Device, 731 F.2d 1253, 1259 (7th Cir.1984) ("Obviously there are many medical devices which would be ineffective at best, and dangerous at worst, if left in the hands of a layman, and [FDA regulations] appear[] to deem any such devices ‘misbranded’ and thus subject to seizure. However, the regulations provide several exemptions from the ‘adequate directions for use’ requirement.”). Caronia does not argue that any such exemption applies here.

. See Wikipedia, Hamlin's Wizard Oil, http:// en. wikipedia. org/wiki/Hamlin’s_Wizard_Oil (last visited May 30, 2012); cf. United States v. Rutherford, 442 U.S. 544, 558, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) ("Since the turn of the century, resourceful entrepreneurs have advertised a wide variety of purportedly simple and painless cures for cancer, including liniments of turpentine, mustard, oil, eggs, and ammonia; peat moss; arrangements of colored floodlamps; pastes made from glycerin and limburger cheese; mineral tablets; and 'Fountain of Youth' mixtures of spices, oil, and suet.... [Hjistorical experience does suggest why Congress could reasonably have determined to protect ... patients [] from the vast range of self-styled panaceas that inventive minds can devise.”).

. This was not the only evidence on which the government relied. As the majority acknowledges, Xyrem is a "powerful central nervous system depressant” that the FDA requires to bear a "black box” warning (the most serious warning placed on prescription medicine) in light of its potential side effects, which include seizure, respiratory depression, coma, and death. Maj. Op. at 155. Yet in the tape-recorded meeting of October 26, 2005 between Caronia and Dr. Chamo, to which the majority refers, Caronia described Xyrem as "a very safe drug," with no contraindications. At Caronia’s second meeting with Dr. Charno on November 2, Dr. Gleason, one of Caronia’s co-conspirators, described many potential uses for Xyrem, including in the treatment of obesity and chronic fatigue, and added that “for the problems with insomnia there's no better drug, no safer drug, it’s as safe as Ambien and Sonata....” Caronia later admitted that his employer required him to meet an annual sales quota of 520 bottles of Xyrem in 2005, the year these conversations took place, and that he was unable to meet it. In fact, the salaries of Orphan’s sales personnel depended to a significant degree on meeting sales targets, and in 2005 Caronia was ranked near the very bottom of Orphan’s national sales force.

. Notably, Caronia himself does not argue that the district court's instruction was improper. While I disagree with the majority's conclusion that the jury was improperly instructed, moreover, I note to be clear that an identical instruction could be problematic in a different case of alleged misbranding — where a defendant argued, for example, that the drug's labeling included adequate directions for uses that were not FDA-approved. Cf. United States v. Articles of Drug, 585 F.2d 575, 585 n. 20 (3d Cir.1978) (instructing the district court, which had "entered no findings of fact as to misbranding" and did not consider the "argument that the drugs were labeled sufficiently for lay use,” to "consider these factors” on remand). Provided a drug bears adequate labeling for an unapproved use, a defendant distributing such a drug cannot be convicted under 21 U.S.C. § 331(a) for introducing a misbranded drug into interstate commerce. Labeling a drug with directions for unapproved uses, however, may violate another provision of the FDCA. See, e.g., Wyeth v. Levine, 555 U.S. 555, 568, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) ("The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label. See 21 U.S.C. § 355; 21 C.F.R. § 314.105(b) (2008). Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application.”).

. Indeed, speech encouraging others to engage in certain legal conduct has long been directly regulated or prohibited in a variety of areas. For example, an insider who is privy to an impending corporate merger is prohibited from telling a friend that one of those companies is a good buy — even if that statement is truthful and even if the friend (who does not realize that she has just been made privy to material nonpublic information) may legally buy stock in that company. See United States v. Gansman, 657 F.3d 85, 92 (2d Cir.2011) (elements of tipper liability); United States v. Falcone, 257 F.3d 226, 234 (2d Cir.2001) (elements of tippee liability). Each of two corporations may be free to raise its prices, but the Sherman Act forbids them from discussing such a course of action. See In re High Fructose Com Syrup Antitrust Litig., 295 F.3d 651, 654 (7th Cir.2002) (Posner, J.); Louis Kaplow, On the Meaning of Horizontal Agreements in Competition Law, 99 Calif. L.Rev. 683 (2011). Likewise, nonlawyers are forbidden from giving legal advice even if the advice is sound, see, e.g., People v. Alfani, 227 N.Y. 334, 125 N.E. 671, 673 (1919), and unlicensed laypersons may not provide medical diagnoses, regardless of their accuracy, see, e.g., Locke v. Ionia Circuit Judge, 184 Mich. 535, 151 N.W. 623, 625 (1915); Commonwealth v. Jewelle, 199 Mass. 558, 85 N.E. 858, 859 (1908).

. Then-Judge Roberts was a member of the unanimous panel.

. Indeed, experts have concluded that most prescriptions for off-label use have little or no scientific support. See Randall S. Stafford, Regulating Off-Label Drug Use: Rethinking the Role of the FDA, 358 New Eng. J. Med. 1427, 1427 (2008) (“In an examination of off-label prescribing of 160 common drugs, off-label use was ... found to account for 21% of all prescriptions, and most off-label drug uses (73%) were shown to have little or no scientific support.”) (citing David C. Radley, Stan N. Finkelstein & Randall S. Stafford, Off-Label *180 Prescribing Among Office-Based Physicians, 166 Archives of Internal Med. 1021 (2006)).

. Nor does the fact that 21 U.S.C. § 331(a) applies criminal penalties necessarily mean that it warrants heightened scrutiny. The case that the majority cites for this proposition, Holder v. Humanitarian Law Project, did not premise its application of heightened scrutiny on the statute's criminal penalties. See - U.S. -, 130 S.Ct. 2705, 2724, 177 L.Ed.2d 355 (2010). Moreover, the Supreme Court has previously applied Central Hudson to statutes that provide for or trigger criminal punishment for speech. See Greater New Orleans Broad. Ass'n, Inc. v. United States, 527 U.S. 173, 177, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); 44 Liquormart, Inc. v. Rhode Is *181 land, 517 U.S. 484, 490 n. 3, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 61-62, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983).

. The second count charged Caronia with doing an act with respect to a drug that resulted in that drug being misbranded.